1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

9  ROGER LIBBY,                          )
                                         )
10          Petitioner,                  )          3:04-CV-0038-LRH-RAM
                                         )
11  vs.                                  )
                                         )          **ORDER**
12  E.K. McDANIEL, *et al.*,             )
                                         )
13          Respondents.                 )
                                         )
14  _____/

15        Before the court for a decision on the merits is an application for a writ of habeas corpus

16  filed by Roger Libby, a Nevada prisoner convicted of two counts of first degree murder with use of a

17  deadly weapon, one count of robbery with the use of a deadly weapon, and five counts of grand

18  larceny.  Docket #39.[1]

19        I.  FACTUAL AND PROCEDURAL HISTORY

20        In its decision on Libby's direct appeal, the Nevada Supreme Court described, as follows, the

21  circumstances surrounding the crimes:

22              In August of 1988, Charles Beatty (Beatty) moved to Winnemucca, Nevada.
            He secured employment at the Pinson Mine and moved into a house at 14 South
23          Street.  Beatty's 24-year-old nephew, James Robertson (Robertson), came with Beatty
            to stay for a couple of weeks.  Robertson had several physical disabilities as a result
24          of contracting Hodgkin's disease (cancer of the lymph glands) when he was 13 years
            old, including partial paralysis, a deformed shoulder, and impaired speech that
25          rendered him unable to scream.  He also wore a leg brace for an injury caused by a
            motorcycle accident.

26  _____

27  [1]        Nearly all documents filed in this case have been imaged and may be accessed electronically via
    CM/ECF, the court's electronic filing system.  Citations to the record indicating a specific page number
28  refer to the CM/ECF pagination.

On September 14, 1988, Beatty was not seen at work and did not answer his telephone at home.  On September 22, 1988, his and Robertson's bodies were found in the desert.  Beatty's fully-clothed body had been stuffed into a trash bin, with his feet exposed.  He had been shot in the back of the head at the base of his skull in an upward direction.  Robertson's body, clothed only in a pair of white jockey shorts, was wrapped in blankets and lay in a ravine.  He had been shot in the top of his head in a downward direction, and his throat had been cut.  Because Robertson's body had begun to decompose, the examining physician could not determine the exact path of the bullet, how long Robertson remained alive or conscious after he was shot, or whether the throat wound was inflicted post-mortem.

A law enforcement team investigated Beatty's residence.  At trial, a blood specialist testified that the blood found on a headboard in the back bedroom was "consistent with that of [Robertson]," to the exclusion of Libby and Beatty.  In the same bedroom, Agent Robert Milby found .22 caliber cartridge casings on the floor under a mattress.  Blood of a type consistent with that of Beatty was discovered in front of the television in the living room.

On September 24, 1988, Renee Montgomery (Montgomery) approached the investigators on South Street and asked if the house was ready to rent.  She explained to a police officer that she had spoken to a man named Roger Libby (Libby) in the early morning of September 14, 1988.  Montgomery had known Libby since June of 1988; he was a customer of the casino where she worked as a bartender.  Libby shared her room at the Winners Hotel in Winnemucca when there were no rooms available in town.  After Labor Day weekend, Libby told Montgomery he was going to stay with Charles Beatty.  On September 14, 1988, he told her that he was returning to Moberly, Missouri, that Beatty was returning to Wyoming, and that they wanted to rent the house to her.  Late that night, he showed her the house, except the room in which Robertson slept, which he told her was a mess.  Montgomery then went back to the casino and did not see Libby again.

On September 24, 1988, Missouri police located Beatty's Chevrolet Blazer in Higbee, Missouri, and arrested Libby as he approached the vehicle.  Troopers Don Ancell and Kevin Hyatt searched the front portion of the Blazer for weapons.  They found Beatty's checkbook and wallet in the pocket of the passenger side door.  Inside the checkbook were bank cards in Beatty's name.  Missouri police officers later found a wallet in Libby's possession, which contained Beatty's Nevada driver's license, Beatty's bank cards, Beatty's First Interstate Bank automatic teller machine card, and Libby's own identification card.  The four digit PIN number which accesses the account was on a piece of paper in the wallet.  The next day, Ancell went to the residence of Libby's friend in Higbee and found several stereo components and other items which belonged to Beatty.  At Libby's place of employment in Missouri, police recovered several tools inscribed with the name Charles Beatty.

On September 26, 1988, Agent Milby and other Nevada law enforcement officers traveled to Missouri to continue the investigation.  They searched the Blazer and discovered a .22 caliber rifle and a box of .22 caliber ammunition.  At trial, a criminal specialist testified that the bullet fragments found in the victims' bodies "were small and consistent with a .22 caliber bullet or something very, very close to it."  Blood of a type consistent with that of Beatty was on the Blazer's carpet.

Several weeks later, police discovered that someone had made three withdrawals from the automatic teller using Beatty's Winnemucca bank account.  One withdrawal occurred in Winnemucca on September 14, 1988, and the next two were in Las Vegas on September 15, 1988.  The same white male individual was shown on

1    video tape using the machines.  The jury viewed all of the tapes and thus had the
     opportunity to identify the user of the machines.

2
          The State filed a felony complaint against Roger Libby, charging him with
3    two counts of murder with the use of a deadly weapon, three counts of robbery with
     the use of a deadly weapon, and five counts of grand larceny.  The State also filed
4    notice of its intention to seek the death penalty.  On February 6 and 7, 1990, the trial
     court heard several motions to suppress evidence, including a motion to suppress
5    Libby's statements to Agent Milby and late Winnemucca Police Chief Reed Hayes.
     The court granted the motion in part, suppressing the statements to Hayes because
6    Libby had requested an attorney during the interview.  The State appealed the
     decision, and this court dismissed the State's appeal (*State v. Libby*, 106 Nev. 1041,
7    835 P.2d 65 (1990)).  The trial commenced on April 5, 1990, and on April 17, 1990,
     Libby was convicted of two counts of first degree murder with the use of a deadly
8    weapon and five counts of grand larceny.  He was sentenced to death on both murder
     counts.

9

10   *Libby v. State*, 859 P.2d 1050, 1052-53 (Nev. 1993).

11        In sentencing Libby to death, the jury found two aggravating circumstances: (1) the murders

12   were committed during the course of a robbery and (2) the murders involved depravity of the mind.

13   The jury found Libby's family background to be a mitigating circumstance.  The judgment of

14   conviction was entered on June 25, 1990.

15        On September 9, 1993, the Nevada Supreme Court affirmed Libby's convictions and death

16   sentences on appeal.  *Id.*  In doing so, however, the court invalidated the depravity of mind

17   aggravating circumstance.  859 P.2d at 1058.  Libby filed a motion for rehearing that was denied on

18   June 27, 1995.

19        On September 25, 1995, Libby filed a petition for certiorari in the United States Supreme

20   Court in which he asserted that the prosecutor in his case impermissibly struck prospective jurors on

21   the basis of gender.  On January 8, 1996, the Court ordered Libby's judgment vacated and remanded

22   the case to the Supreme Court of Nevada for further consideration in light of *J.E.B. v. Alabama ex*

23   *rel. T.B.*, 511 U.S. 127 (1994).  *Libby v. Nevada*, 516 U.S. 1037 (1994).  The Nevada Supreme Court

24   subsequently remanded the case to the state district court for an evidentiary hearing.  *Libby v. State*,

25   934 P.2d 220 (Nev. 1997).

26        After holding an evidentiary hearing, the state district court issued, on December 8, 1997, its

27   written findings of fact and conclusions of law, in which it denied relief.  Libby appealed.  On April

28   2, 1999, the Nevada Supreme Court affirmed the lower court.  *Libby v. State*, 859 P.2d 1050,

1052-53 (Nev. 1993). Libby's petition for rehearing was denied on July 13, 1999. Libby filed another petition for certiorari in the United States Supreme Court. That petition was denied on January 18, 2000. *Libby v. Nevada*, 528 U.S. 1119 (2000).

On February 8, 2000, Libby filed a state petition for writ of habeas corpus in the Sixth Judicial District Court, Humboldt County, followed by supplemental petitions on May 5, 2000, and March 6, 2001. The district court held evidentiary hearings on January 4, 2001, March 21, 2001, March 27, 2002, and August 29-30, 2002. On September 30, 2002, the district judge denied Libby's petition for writ of habeas corpus. Libby appealed. On November 4, 2003, the Nevada Supreme Court affirmed the trial judge's denial of habeas relief.

On January 13, 2004, this court received Libby's petition for writ of habeas corpus under 28 U.S.C. § 2254. On February 2, 2004, the court appointed counsel for Libby. On September 11, 2006, and January 19, 2007, Libby filed in this court, respectively, an amended petition for writ of habeas corpus and a supplement to his petition. On November 16, 2007, Libby filed a state post-conviction petition in the Sixth Judicial District Court in which he raised only one claim – a challenge of his death sentence based on the Nevada Supreme Court's opinion in *McConnell v. State*, 102 P.3d 606 (Nev. 2004).[2]

On January 10, 2008, respondents filed a motion to dismiss this action, arguing that this court may not grant habeas relief while Libby's post-conviction petition was pending in state court. In response, Libby asked the court proceed with the adjudication of his guilt phase claims, but stay proceedings with respect to the penalty phase claims while he pursued relief in state court. Not willing to dismiss this action or bifurcate the adjudication of Libby's claims, but recognizing that the pending petition likely contained unexhausted claims, this court entered, on July 21, 2008, an order directing the parties to submit points and authorities regarding the exhaustion status of all of Libby's claims for relief. On October 9, 2008, the State filed an answer to Libby's state petition, in which it

---

[2]    In *McConnell*, the Nevada Supreme Court ruled that it is "impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated." *McConnell*, 102 P.3d at 624. The Nevada Supreme Court subsequently decided that *McConnell* represents a change in the substantive law, and that it therefore is to be applied retroactively. *See Bejarano v. State*, 146 P.3d 265, 274 (Nev. 2006).

conceded that, based on *McConnell*, Libby was no longer eligible for the death penalty.

On October 15, 2008, Libby filed a notice in this court waiving Claims Thirteen, Fifteen, Eighteen, Nineteen, Twenty, and Twenty-one.  In an order entered on October 30, 2008, this court determined that Claims One(A), One(D), One(E), One(G), Three, Four, Six, Seven, Eight, Nine, Sixteen(B), Seventeen, Twenty-two, and a supplemental prosecutorial misconduct claim had not been exhausted in state court.

On November 6, 2008, the state district court entered an amended judgment of conviction, pursuant to a stipulation, that vacated the death sentences and imposed, for each murder, a life sentence with possibility for parole and a consecutive life sentence with possibility for parole for the use of a deadly weapon, both to run concurrently.  On December 18, 2008, under threat of dismissal pursuant to *Rose v. Lundy*, 455 U.S. 509 (1982), Libby filed a notice abandoning the claims found unexhausted in the order of October 30, 2008.

The claims that remain – Claims One(B), One(C), One(F), Two, Five, Ten, Eleven, Twelve, Fourteen, Sixteen(A), and a supplemental ineffective assistance of counsel claim – are the subject of this decision on the merits.[3]

## II.  STANDARDS OF REVIEW

To obtain habeas relief under 28 U.S.C § 2254, a petitioner must establish that "he is in custody in violation of the Constitution or laws or treaties of the United States."  Because this habeas action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 under the Antiterrorism and Effective Death Penalty Act (AEDPA) apply.  *See Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).  The provisions of AEDPA substantially limit the federal court's ability to grant habeas relief where the state court has already considered and ruled upon the merits of a claim.  *See Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997) (noting "highly deferential standard for evaluating state court rulings" imposed by 28 U.S.C. § 2254(d)).  Where that has occurred, habeas relief is not available unless state court adjudication was "contrary to, or involved an unreasonable application of, clearly

---

[3]    On May 3, 2010, this court denied Libby's motion for an evidentiary hearing in relation to his petition.  Docket #150.

1  established Federal law" (28 U.S.C. § 2254(d)(1)) or "resulted in a decision that was based on an

2  unreasonable determination of the facts" (28 U.S.C. § 2254(d)(2)).

3      With respect to § 2254(d)(1), a state court decision falls within the "contrary to" clause only

4  when (1) the state court has failed to apply the correct controlling authority from the Supreme Court

5  or (2) the state court has applied the correct controlling authority from the Supreme Court to a case

6  involving facts "materially indistinguishable" from those in a controlling case, but has nonetheless

7  reached a different result. *See Williams v. Taylor*, 529 U.S. 362, 404-13 (2000). Under the

8  "unreasonable application" prong, this court is unable to grant habeas relief unless the state court's

9  application of the correct controlling authority to the facts of the petitioner's case was objectively

10  unreasonable. *Williams*, 529 U.S. at 409.

11      To be "objectively unreasonable" the state court decision must exceed even the "clear error"

12  standard. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Supreme Court held that using the

13  "clear error" standard "fails to give proper deference to state courts by conflating error (even clear

14  error) with unreasonableness." *Id.* (citations omitted). Accordingly, to fall within the "unreasonable

15  application" clause, the state court's decision must be more egregious than an incorrect or erroneous

16  application of the federal law. If the state court's decision meets either prong of § 2254(d)(1), then

17  this court's review for habeas relief is de novo. *Frantz v. Hazey*, 533 F.3d 724, 737 (9th Cir. 2008)

18  (en banc).

19      The Ninth Circuit has held that the standard of objective unreasonableness also applies to

20  challenges to a state court's factual findings under 28 U.S.C. § 2254(d)(2). *See Taylor v. Maddox*,

21  366 F.3d 992, 999 (9th Cir. 2004). In addition, state court findings of fact are presumed to be correct

22  unless the petitioner rebuts the presumption with clear and convincing evidence. *See* 28 U.S.C. §

23  2254 (e)(1); *Davis v. Woodford*, 333 F.3d 982, 991 (9th Cir. 2003). This presumption applies even if

24  the finding of fact was made by a state appeals court rather than a state trial court. *Bragg v. Galaza*,

25  242 F.3d 1082, 1087 (9th Cir.) *amended by* 253 F.3d 1150 (9th Cir. 2001).

26      For any habeas claim that has not been adjudicated on the merits by the state court, the

27  federal court reviews the claim de novo without the deference usually accorded state courts under 28

28  U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313

6

F.3d 1160, 1167 (9th Cir. 2002).  In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply.  *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is de novo).

Lastly, the Court in *Lockyer* rejected a Ninth Circuit mandate for habeas courts to review habeas claims by conducting a de novo review prior to applying the "contrary to or unreasonable application of" limitations of 28 U.S.C. § 2254(d)(1).  *Lockyer*, 538 U.S. at 71.  In doing so, however, the Court did not preclude such an approach.  "AEDPA does not require a federal habeas court to adopt any one methodology in deciding the only question that matters under § 2254(d)(1) – whether a state court decision is contrary to, or involved an unreasonable application of, clearly established Federal law."  *Id.*

III.  ANALYSIS OF CLAIMS

**Claim One**

In Claim One, Libby claims that his conviction and sentence are invalid due to violations of his right to effective assistance of counsel.  Claims One(B), One(C), and One(F) are each based on a separate alleged shortcoming in the representation provided by trial counsel.  Because they each challenge a particular aspect of counsel's performance (as opposed to alleging a complete failure to test the prosecutor's case), the claims are governed by the *Strickland* standard.  *See Bell v. Cone*, 535 U.S. 685, 697-98 (2002) (referring to *Strickland v. Washington*, 466 U.S. 668 (1984)).  Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief: deficient performance and prejudice.  466 U.S. at 687.  With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness."  *Id.* at 688.  A reviewing court "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell*, 535 U.S. at 702 (quoting *Strickland*, 466 U.S. at 689).

With respect to the prejudice prong, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors."  *Strickland*, 466 U.S. at 696.  The Court in *Strickland* emphasized that the

7

"ultimate focus" of an ineffective assistance of counsel inquiry "must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* If the defendant makes an insufficient showing as to either one of the two *Strickland* components, the reviewing court need not address the other component. *Id.* at 697.

> . . . In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. . . .

*Id.* With these standards in mind, the court now turns to Libby's specific ineffective assistance claims.

    *Claim One(B)* – In Claim One(B), Libby alleges that counsel was ineffective in failing to investigate or challenge the forensic evidence that the State used against him at trial. Among the issues Libby contends his counsel should have explored is the integrity of the two crime scenes (i.e., the victims' home and the victim's (i.e., Beatty's) Chevrolet Blazer). Libby also faults counsel for not delving into the reliability of testimony from three State's experts: David Atkinson (regarding firing pin impressions), David Billau (forensic investigator), and Donald Havekost (regarding comparative bullet lead analysis (CBLA)). In support of this claim, Libby proffers a declaration from William Jerry Chisum, an experienced professional criminalist who reviewed reports and photographs relating to the murders in this case. Docket #39-3, p. 197-223.

    With respect to the victims' home, Libby points to the lag time (approximately ten days) between the time the victims were last seen and the date Washoe County forensic investigators processed the residence for evidence and cites Chisum's opinion that the presence of water droplets in the kitchen sink (as shown in photographs admitted at Libby's trial) demonstrates that the crime scene was compromised. Libby also notes that, even though the Washoe County investigators spent 30 hours processing the scene, a shell casing later connected to the ammunition found in Beatty's Blazer was not recovered until two agents from the Nevada Division of Investigation allegedly found it under a bed several days later in a subsequent search of the home. As for evidence located in the Chevrolet Blazer, Libby contends that the investigators' apparent failure to determine the

1  number of .22 caliber cartridges found in the partially empty box was an important omission because

2  the shell casing belatedly discovered in the residence could have been taken from the box and placed

3  at the home.

4      David Atkinson from the Washoe County Crime Lab testified for the State as a firearms

5  expert.  According to his testimony, the shell casing found in the victims' residence was fired by the

6  rifle found in the Blazer.  Again relying on Chisum's declaration, Libby claims this testimony was

7  unreliable because (1) Atkinson failed to explain or demonstrate how he came to that conclusion, (2)

8  the Washoe County Crime Lab was not accredited by a recognized authority at the time, (3) no

9  evidence was presented as to Atkinson's or the lab's proficiency in the comparison of firing pin

10  impressions, and (4) no evidence established that Atkinson was certified by any recognized

11  authority.

12      David Billau was one of the forensic investigators who processed the victims' residence for

13  evidence.  He was qualified as a fingerprint expert at Libby's trial.  Libby alleges that Billau

14  misrepresented his academic credentials during his testimony at trial by stating that he had received

15  a bachelor of science degree from California State University at Los Angeles.  According to a

16  transcript of his testimony in a trial several years later, Billau did not complete that degree.

17      Havekost was an FBI agent called as an expert witness for the State to testify about

18  "comparative bullet lead analysis" (CBLA).  According to his testimony, Havekost conducted a

19  compositional analysis of the lead in the bullets or bullet fragments recovered from each of Libby's

20  victims, bullets in the box found in the Blazer, and bullets found in the .22 rifle found in the vehicle.

21  Docket #128-37, p. 8-36; docket #128-38, p. 2.  Havekost concluded that all of the bullets could

22  have come from the box found in the vehicle.  *Id*.  Libby argues that a "constitutionally adequate"

23  investigation would have allowed his trial counsel to challenge the scientific basis of Havekost's

24  testimony.

25      Considered under the *Strickland* standard, Claim One(B) does not provide grounds for

26  habeas relief.  Libby's allegations in relation to defense counsel's inadequate investigation of the

27  crime scenes are, for the most part, speculative.  Beyond suggesting possible malfeasance in relation

28  to the belated discovery of the shell casing, Libby has not specified the manner in which evidence

1    collected at the residence or from the Blazer was rendered untrustworthy by the alleged lack of the

2    integrity of either crime scene.

3         As to the shell casing, defense counsel effectively highlighted its belated discovery for the

4    jury during closing argument –  noting at one point that it was "interesting" that the casing was not

5    found until long after the initial inspection of the scene and at another point that it was "remarkable"

6    that the forensic specialists were looking for hairs and did not notice a shell casing.  Docket #129-2,

7    p. 42; docket #129-3, p. 9.  Libby argues that defense counsel should have challenged the admission

8    of the shell casing into evidence or, at least, Milby's testimony regarding his role in both

9    impounding the box of bullets found in the Blazer and locating the shell casing in the home.  Libby

10   has not shown, however, a reasonable likelihood that either endeavor would have been successful,

11   much less impact the outcome of the trial.  Also, the notion that a determination as to the number of

12   bullets in the partially empty box found in the Blazer would have shown that the shell casing was

13   placed in the residence by the State is pure conjecture.

14        With regard to counsel's alleged failure to challenge Atkinson's testimony, defense counsel

15   testified at the post-conviction evidentiary hearing that he was receiving reports from his own

16   ballistic experts right up until the time of trial.  Docket #135-23, p. 13.  When asked why he did not

17   seek a continuance to either validate or contest Atkinson's findings, defense counsel testified that he

18   did not want to antagonize the jury and that he thought that he had covered the necessary points

19   during cross examination.  *Id.*, p. 14.

20        Defense counsel explained to the jury in closing argument that the State had failed to

21   substantiate Atkinson's conclusion that the shell casing matched the rifle found in the Blazer:

22        . . . [W]hat are we told about [the shell casing]?

23        All we are told is that Mr. Atkinson felt that the marks on the shell casing
     corresponded to firing pin marks from this gun, but they didn't bring a picture of that
24   in to show you.

25        It is very simple to make a photograph with a comparison microscope just like
     you had on the fingerprints, one cartridge against another, and they disregarded
26   several other things that are very interesting.

27        You were told how every time metal touches metal there will be an imprint,
     but we didn't have any discussion of the extractor marks or the ejector marks.

28

10

1          None of that was present, so we really don't know that this is from that gun.

2   Docket #129-2, p. 42-43.  Libby has not shown that an independent analysis of the shell casing by a

3   defense expert would have produced a result different than the one obtained by Atkinson.  Thus,

4   even if counsel's performance in challenging Atkinson's testimony was deficient, Libby has not met

5   the burden of showing that the outcome of his trial was prejudiced by counsel's alleged errors.  *See*

6   *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (holding that mere speculation that an arson

7   expert could have been found to testify on defendant's behalf at trial is not sufficient to establish

8   *Strickland* prejudice).

9          As to counsel's alleged failure to adequately challenge the reliability of Billau's testimony,

10  counsel's failure to unearth or exploit Billau's alleged misrepresentation of his academic credentials

11  does not place counsel's performance below an objective standard of reasonableness, especially

12  given that the credential at issue was only marginally relevant to qualifying Billau as a fingerprint

13  expert.  See Docket #128-33, p. 29-32.

14         This court also finds that Libby's counsel performed within constitutional standards in

15  addressing the  CBLA evidence presented by Havekost.[4]  On cross-examination, counsel elicited

16  testimony from Havekost as to the possibility that numerous other boxes could contain bullets with

17  the same composition as those in the box found in the Blazer.  Docket #128-38, p. 2-15.  He also

18  questioned Havekost about the likelihood of bullets with lead from different batches ending up in the

19  same box.  *Id.*  In closing arguments, the prosecution noted how highly probable it was, based on

20  Havekost's testimony, that the bullets recovered from the victims came from the box found in

21  Libby's possession, while defense counsel characterized Havekost's testimony as leaving open the

22  possibility that the bullets could have come from another source.  Docket #129-2, pp. 8-8, 43-45.

23         Libby points to several studies that call into question the validity of CBLA as forensic

24  evidence.  He also notes that the FBI no longer uses CBLA and, more recently, publicly

25  acknowledged that it produced unreliable evidence.  However, none of the research or findings

26  _____

27  [4]      The portion of Claim One(B) related to the testimony of Donald Havekost has already been
   addressed by this court in its order denying Libby's motion for an evidentiary hearing.  Docket #150.
28  Some of the following discussion is derived from that order.

1   Libby relies upon to discredit CBLA appears to have been published at the time of his trial.  See

2   docket #39, p. 144-151.  And, according Libby's own allegations, the FBI did not decide to

3   discontinue the use of CBLA until 2005 (docket #39, p. 152) and did not publicly concede its

4   unreliability until 2007 (docket #148, p. 5).

5        In assessing whether counsel's performance met the constitutional standard, the court must

6   make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the

7   circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

8   perspective at the time."  *Strickland*, 466 U.S. at 689.  Addressing a similar habeas challenge in a

9   Florida case with facts bearing a striking resemblance to those present here (a 1990 murder trial at

10  which Havekost testified that CBLA showed that a bullet fragment recovered from the victim

11  matched bullets contained in a box of ammunition tied to the defendant), the Court of Appeals for

12  the Eleventh Circuit concluded that defense counsel's failure to adequately challenge Havekost's

13  testimony did not fall below the *Strickland* standard because there was a lack of research available at

14  the time of trial indicating that CBLA was flawed.  *Smith v. Secretary, Dept. of Corrections*, 572

15  F.3d 1327, 1350 (11th Cir. 2009) ("Just as counsel are not required to anticipate changes in the law,

16  neither are they required to anticipate changes in science.").  This court reaches the same conclusion

17  with respect to the performance of Libby's counsel in this case.

18       Even assuming that trial counsel's failure to mount a more vigorous challenge to Havekost's

19  testimony placed his performance below the constitutional standard, Libby still cannot demonstrate a

20  reasonable probability that, but for counsel's performance in this regard, the result of the proceeding

21  would have been different.  He has offered no evidence that, as of 1990, the research or expertise

22  necessary to successfully challenge CBLA evidence was reasonably available to trial counsel.  Thus,

23  here again, Libby can only speculate as to whether more investigation by trial counsel would have

24  allowed him to effectively discredit the testimony at issue.  *See Wildman,* 261 F.3d at 839.

25       For the foregoing reasons, Libby has not met the Strickland standard as to Claim One(B).

26  Thus, the claim is denied.

27       *Claim One(C)* – In Claim One(C), Libby alleges that counsel was ineffective in failing to

28  investigate or challenge the credibility of Renee Montgomery.  Montgomery testified for the State

about her involvement with Libby and going with him to Beatty's house near the time of the murders (as recounted in the Nevada Supreme Court decision excerpted above).  Libby contends that an adequate investigation into Montgomery's background would have produced several witnesses who could have testified as to her history of drug abuse and her reputation for dishonesty.

To support this contention, Libby proffers the written statements of six people who were acquainted with or had contact with Montgomery in Winnemucca sometime in 1987-1988.[5]  Docket #139-3, pp. 123-131, 172-174, 297-299, 348-352.  With varying degrees of specificity, the statements indicate that Montgomery was a routine drug user and was suspected of various acts of dishonesty, including theft.  Libby also claims that a comparison of her statements to the police, her grand jury testimony, and her trial testimony yields several inconsistencies that counsel failed to use to impeach her testimony.

Even assuming the "potential" witnesses were available and willing to testify, this court questions the impeachment value of information about Montgomery's drug abuse and suspected acts of dishonesty.  There has been no showing that Montgomery was impaired during the events about which she testified or that she had any incentive to lie about those events.  Her testimony about her visit to Beatty's residence with Libby, including the date, time, and duration of the visit, was corroborated by the testimony of the shuttle driver who drove both of them to the residence and later picked up Montgomery.  Docket #128-24, p. 40.  And, notwithstanding any inconsistency in her statements as to some events, Montgomery was consistent in noting two other incriminating facts – that Libby seemed nervous while showing her the home and that Libby did not show her one of the bedrooms.  Thus, Libby has not demonstrated that he was prejudiced by counsel's alleged failure to adequately challenge Montgomery's testimony.

*Claim One(F)* – In Claim One(F), Libby alleges that counsel was ineffective in failing to investigate issues related to actual and prospective jurors.  As for actual jurors, Libby contends that counsel should have followed up (either during jury selection or after the trial) with a juror, Dennis Brown, who indicated during voir dire that he knew of Libby from a work-related truck accident in

_____

[5]     All six statements are dated sometime in 2006.

1   which Libby was one of the drivers.  In addition, he alleges that counsel was ineffective for not

2   contacting another juror, Richard Brown, after trial to interview him about his opinions on the death

3   penalty and mitigating evidence.

4         Dennis Brown and Richard Brown both signed declarations for Libby's counsel in 2005.

5   Docket #39-3, p. 106-114.  Dennis Brown indicated that he believed that Libby was under the

6   influence of drugs at the time of the truck accident and that Renee Montgomery was intoxicated at

7   the time of her testimony at Libby's trial.  Richard Brown expressed his frustration with the

8   deliberation process and suggested that, absent extenuating circumstances, the death penalty is the

9   appropriate punishment for murder.  Both indicated that no amount of mitigating evidence would

10  have persuaded them to change their verdict from the death penalty to a lesser sentence.

11        The voir dire transcript does not show that either juror was biased.  Both jurors answered

12  voir dire questions in a manner that indicated that they could be fair and impartial jurors.  Docket

13  #125-12, p. 29-50 (Dennis Brown); docket #125-11, p. 6-44 (Richard Brown).  Defense counsel's

14  voir dire of Dennis Brown on the subject of the truck accident was adequately thorough under the

15  circumstances.  Indeed, Libby does not specify what additional inquiry counsel should have pursued.

16        As for counsel's failure to contact either juror after the trial, there is no allegation that either

17  juror engaged in misconduct.  Libby cites no authority for the position that defense counsel, even in

18  a capital case, has an affirmative duty to contact jurors after an unfavorable verdict.  Moreover, the

19  chances are exceedingly remote that interviewing either or both jurors would have enabled Libby's

20  counsel to successfully challenge Libby's conviction or sentence.

21        With regard to prospective jurors, Libby claims that counsel was ineffective in not

22  investigating the circumstances behind two individuals, Marlene Fettic and Leonore Owens, who

23  were on the list of prospective jurors to be called for service, but who did not appear.  Such an

24  investigation is well beyond the scope of that required for professionally competent assistance and,

25  in fact, might be considered an unwise use of counsel's time and resources.  Moreover, Libby makes

26  no showing as to how the omission may have affected the outcome of his case.  Claim One(F) is

27  denied.

28        *Supplemental IAC claim* – In his *pro se* supplement to his petition (docket #47), Libby

alleges that counsel was ineffective in calling Raynie Beatty, Charles Beatty's ex-wife, as a witness

for the defense.  In an effort to defend against the robbery charge, the defense elicited testimony

from Ms. Beatty about what Charles routinely did with his keys and his wallet when he came home

from work.  Asserting that Ms. Beatty's testimony actually supported the State's theory that Charles

had his keys and wallet with him when killed, Libby argues that his counsel performed ineffectively

by not personally interviewing her before calling her as a witness.

The state district court rejected this claim in Libby's first post-conviction proceeding.

Docket #135-30, p. 7-11.  The state court found that lead defense counsel called Ms. Beatty as a

witness on the advice of co-counsel and an investigator for the defense, both of whom had

interviewed her.  *Id*. The court concluded as follows:

> . . . It goes without saying that the State might have called this witness.  Her mother
> also testified that Beatty usually kept his keys on a belt loop on his pants.  (underlined
> for emphasis) It was reasonable to call the daughter as a matter of strategy.  Strategy
> is "virtually unchallangeable absent extraordinary circumstances." Howard v. State,
> 106 Nev. 713, 722, 800 P.2d 175 (1990), citing Strickland, 466 U.S. at 691.  While
> one lawyer might conclude this was the wrong witness to call, reasonable lawyers
> could conclude otherwise.
>
> If Mr. Beatty's former wife had not testified would the outcome have been
> different?  The Court concludes to the contrary.  The mother-in-law provided similar
> evidence.

*Id.*, p. 11.  The Nevada Supreme Court addressed the claim on appeal and held as follows:

> Appellant seems to contend that the district court erred in rejecting the claim
> that trial counsel should not have called the victim's ex-wife to testify at the guilt
> phase of the trial without having personally interviewed her.  In its order, the district
> court found that eliminating the witness's testimony would not have changed the
> outcome of appellant's trial because another witness provided similar testimony
> regarding the victim's habit as to his wallet and keys.  A district court's factual
> findings regarding a claim of ineffective assistance are entitled to deference so long
> as they are supported by substantial evidence and are not clearly wrong.  Appellant
> does not specifically address any impropriety in the district court's conclusion, much
> less provide cogent argument regarding any alleged error, nor did he include any of
> the trial transcripts in his appendix.  He has therefore failed to provide this court with
> any reason to question the district court's conclusion that the witness's testimony did
> not result in prejudice.

Docket #136-24, p. 7-8 (citations omitted).

The state court's adjudication of the claim did not result in a decision that was contrary to, or

involved an unreasonable application of, clearly established federal law, nor did it result in a

decision that was based on an unreasonable determination of the facts in light of the evidence

1   presented in the state court proceeding.  Accordingly, the supplemental IAC claim is denied.

2                              **Claim Two**

3           In Claim Two, Libby claims that the prosecutor used seven of nine peremptory

4   challenges to excuse female jurors, in violation of *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127

5   (1994).  In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court established the

6   principle that using peremptory challenges to exclude jurors on account of race violates the Equal

7   Protection Clause.  Trial courts must use a three-part test to evaluate a *Batson* claim:

> First, the trial court must determine whether the defendant has made a prima facie
> showing that the prosecutor exercised a peremptory challenge on the basis of race.
> [*Batson*,] 476 U.S., at 96-97.  Second, if the showing is made, the burden shifts to the
> prosecutor to present a race-neutral explanation for striking the juror in question.  *Id.*,
> at 97-98.  Although the prosecutor must present a comprehensible reason, "[t]he
> second step of this process does not demand an explanation that is persuasive, or even
> plausible"; so long as the reason is not inherently discriminatory, it suffices.  *Purkett
> v. Elem*, 514 U.S. 765, 767-768 (1995) (per curiam).  Third, the court must then
> determine whether the defendant has carried his burden of proving purposeful
> discrimination.  *Batson*, *supra*, at 98.  This final step involves evaluating "the
> persuasiveness of the justification" proffered by the prosecutor, but "the ultimate
> burden of persuasion regarding racial motivation rests with, and never shifts from, the
> opponent of the strike."  *Purkett*, *supra*, at 768.

15  *Rice v. Collins*, 546 U.S. 333, 338 (2006) (parallel citations omitted).  In *J.E.B.*, the Court extended

16  *Batson* to peremptory challenges based on gender.

17          The peremptory challenges in Libby's case began when twelve jurors (eight men, four

18  women) had been passed for cause.  Docket #125-14, p. 6.  The State used its first peremptory

19  challenge to excuse a woman (Betty Martin).  *Id.*  Then, with each additional juror passed for cause,

20  one side (depending on whose turn it was) would exercise one of its eight peremptory challenges.

21  The State used its next four peremptory challenges to excuse women (Debra Hill, Sherry Stewart,

22  Phyllis Jarzombek, Vera Gastelecutto).  Docket #125-16, p. 6; docket #125-17, p. 5; docket #125-19,

23  p. 8; docket #125-21, p. 26.

24          The State waived its sixth peremptory challenge (docket #125-23, p. 26), but when it used its

25  seventh to remove a woman (Ana Marie Smith), Libby's counsel raised a "*Batson* type objection,"

26  noting that the State had used six of its seven peremptory challenges to remove women.  Docket

27  #125-24, p. 29.  With the decision in *J.E.B.* still four years in the future, the trial court overruled the

28  objection without conducting a *Batson* hearing.  *Id.*, p. 30.  The State subsequently waived its eighth

1  and final peremptory challenge.  Docket #125-26, p. 12.  In selecting alternates, the State used its

2  one allotted peremptory challenge to remove a woman (Mary Klassen).  Docket #125-30, p. 6.

3       As recounted above, the United States Supreme Court relied on *J.E.B.* to grant Libby a

4  petition for certiorari and remand his case to the Supreme Court of Nevada.  *Libby v. Nevada*, 516

5  U.S. 1037 (1994).  Concluding that Libby had established a prima facie case of intentional gender

6  discrimination, the Nevada Supreme Court remanded the case to the state district court for an

7  evidentiary hearing to resolve the other two steps of the *Batson* inquiry.  *Libby v. State*, 934 P.2d

8  220, 224 (Nev. 1997).

9       At the evidentiary hearing, the State presented the testimony of the prosecutor, Jack

10  Bullock.[6]  In addition to explaining his general approach to selecting a jury in a death penalty case,

11  Bullock gave the following reasons for exercising each of his peremptory challenges.

12       *Betty Martin* – Bullock testified that he peremptorily challenged Martin because she

13  hesitated in answering questions about the death penalty and seemed to have difficulty

14  understanding the concept of circumstantial evidence.  Docket #132-18, p. 27-29. He also testified

15  that Martin's failure to return the jury questionnaire was a factor in his decision to excuse her.  *Id.*

16       *Debra Hill* – Bullock testified about several factors that caused him to excuse Hill.  *Id.*, p.

17  29-33.  Among them were that she had four children (including an infant), lived forty miles away,

18  and had a brother-in-law who was a law enforcement officer and whose ex-wife had contacted the

19  prosecutor's office about a child support matter.  *Id.*  He also explained that, before he became

20  district attorney, Hill's husband had sought his representation in a legal matter and that he did not

21  take the case, which could have given rise to some resentment.  *Id.*  In addition, Bullock testified that

22  he was concerned about her apparent difficulty in grasping the concept of reasonable doubt.  *Id.*

23       *Sherry Stewart* – With respect to Stewart, Bullock testified that he excused her because her

24  brother had been prosecuted in Humboldt County on driving and drug offenses and because she had,

25  during voir dire, expressed indecision about the death penalty.  *Id.*, p. 33-35.

26       *Phyllis Jarzombek* – Bullock testified that one of the reasons he excused Jarzombek was that

27

28  _____

[6]     The State also presented the testimony of Bullock's co-counsel Stuart Newman.  Libby called defense co-counsel, Terrence McCarthy, as a witness.

17

a member of her family had been the victim of a burglary, a crime that is often not solved, thereby

resulting in the victim's dissatisfaction with law enforcement.  *Id.*, p. 37-38.  Other reasons he

identified in his testimony were her hesitance in responding to death penalty questions during voir

dire and the fact that she had taken a psychology course in college.  *Id.*, p. 38-39.  Bullock also

testified that Jarzombeck failed to complete the jury questionnaire.  *Id.*, p. 36.

*Vera Gastelecutto* – Bullock testified that he excused Gastelecutto because he had once

represented one of her family members, she did not fill out a jury questionnaire, and she wavered in

answering questions about her position on the death penalty.  *Id.*, p. 39-41.

*Ana Marie Smith* – Bullock testified that he had met Smith socially on several occasions and

knew that she and her husband owned a motel in town.  *Id.*, p. 41-42.  He explained that he was

concerned about Smith being able to devote her full attention to the trial while being away from the

motel, which he described as a "mom and pop operation," during a potentially busy time of year.

*Id.*, p. 42-43.   He also testified that Smith seemed to be confused and rattled by the prospect of

imposing the death penalty as a possible sentence.  *Id.*, p. 44.

*Mary Klassen* – Bullock testified that his primary reason for excusing Klassen was that she

stated during voir dire that, if required to decide the death penalty issue, she would be "haunted by

it."  *Id.*, p. 46.

In its subsequent order denying Libby's *J.E.B.* claim, the state district court found that the

prosecutor had presented gender-neutral reasons for peremptorily challenging the female jurors in

question and concluded, based on the evidentiary hearing and the record, that the prosecutor did not

engage in purposeful gender discrimination.  Docket #132-22.  The court noted the following factors

in reaching that conclusion.  Bullock waived two challenges that could have been used against

female jurors.  The ultimate composition of the jury was almost equal in terms of gender – five

women and seven men.  Bullock resisted the defense's attempt to excuse female juror Susan Brown

(see discussion of Claim Twelve, below).  Bullock freely stipulated to excusing several men from

the panel.  Rather than suggest gender bias, Bullock's voir dire questioning was designed to identify

"strong jurors," and weed out jurors "who hesitated in their answers and who could not grasp

concepts, such as reasonable doubt and circumstantial evidence."  *Id.*, p. 7.

In affirming the lower court's decision, the Nevada Supreme Court stated, in part, as follows:

> The Supreme Court in *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995), held that a neutral reason need not be persuasive or even plausible. A legitimate reason for excluding a juror "is not a reason that makes sense, but a reason that does not deny equal protection." *Id*. at 769. "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed ... neutral.'" *Id*. at 768 (quoting *Hernandez* [*v. New York*, 500 U.S. 352, 360 (1991)] ).

> In this case, Bullock gave several reasons for challenging each woman, although he qualified his list by stating that some reasons for each woman were more instrumental in his decision than other reasons. For example, Bullock explained that each of the excluded women expressed at least some hesitancy in imposing the death penalty and he did not believe that further voir dire examination alleviated that hesitancy; this was the most decisive factor for his use of the peremptory challenges.

> Bullock testified that he wanted "strong" jurors who had no hesitancy about the possibility of imposing a death sentence, could grasp legal concepts despite the fallacies depicted on television, and could give their full attention to a lengthy trial. He further testified that he never purposely excluded women because he knew that women have the same ability to be good jurors as men and sometimes women are even "stronger" about imposing a death sentence. He stated that the five women who remained on the jury were all very "strong" people and he was satisfied with the final selection of jurors. Overall, the reasons Bullock proffered do not inherently contain any discriminatory motive. Accordingly, step two, providing gender neutral reasons, was satisfied.

> With regard to step three, the trial court's evaluation of whether purposeful discrimination exists, the law is well settled that a reviewing court will give great deference to the trial court's decision. *Hernandez* held that deference is the best standard because the trial court's decision turns largely on the credibility of the prosecutor. 500 U.S. at 365. Accordingly, a trial court's findings will not be overturned unless they are "clearly erroneous." *Id*. at 369; *see also Turner* [*v. Marshall*, 121 F.3d 1248, 1251 (9th Cir. 1997)]; *Thomas v. State*, 114 Nev. 1127, 1137, 967 P.2d 1111, 1118 (1998).

> After a review of the record, including the voir dire transcripts, the evidentiary hearing transcripts, and the district court's findings of fact and conclusions of law, we conclude that the district court's decision that there was no purposeful discrimination in the state's use of peremptory challenges was not clearly erroneous. The district court judge had the benefit of observing firsthand the jury selection process, as well as the evidentiary hearing. He was in the best position to evaluate Bullock's credibility and the excused jurors' demeanor and answers. Accordingly, the district court's decision was not clearly erroneous, and reversal is not warranted.

*Libby*, 975 P.2d at 839 (parallel citations and footnote omitted).

At issue here is the third step of the *Batson* inquiry – i.e., the determination as to whether Libby has proved purposeful racial discrimination. The ultimate determination of whether the prosecutor acted with discriminatory intent resolves a question of fact. *Purkett*, 514 U.S. at 769. Thus, in cases where the state court has properly applied *Batson*'s burden-framework and denied

19

1   relief, a federal court can grant habeas relief only "if it was unreasonable to credit the prosecutor's

2   race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338-339 (2006)

3   (applying § 2254(d)(2) as the standard of review). Moreover, this review focuses on the state *trial*

4   court's factual determination, even where, as here, there is a state appellate court opinion addressing

5   the claim on direct review. *See, e.g.*, 546 U.S. at 338-39.

6       In light of these standards, Libby is not entitled to habeas relief. Bullock's stated reasons for

7   excusing each juror related to plausible trial strategies and do not indicate pretext for purposeful

8   discrimination. *See*, *e.g*., *Rice*, 546 U.S. at 338-40; *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)

9   (*Miller-El I*). In addition, nearly all of his reasons are supported by the voir dire record. To the

10  extent they are not, Libby has not demonstrated that Bullock's testimony at the evidentiary hearing

11  was unreliable. As noted, the ultimate composition of the jury was only one juror away from being

12  evenly gender-balanced, and Bullock waived two opportunities to excuse a female juror

13  notwithstanding that the Supreme Court had yet to extend *Batson* to gender discrimination.

14  Accordingly, the state district court's finding that the prosecutor did not engage in purposeful gender

15  discrimination in exercising peremptory challenges was not unreasonable.

16      Libby argues, however, that the state court was unreasonable in its application of the third

17  prong of the *Batson* analysis because it failed to consider all relevant circumstances, most notably

18  evidence that Bullock did not excuse similarly-situated male jurors. In *Miller-El v. Dretke*, 545 U.S.

19  231 (2005) (*Miller-El II*), the Supreme Court noted that "[i]f a prosecutor's proffered reason for

20  striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is

21  permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at

22  *Batson*'s third step." 545 U.S. at 241. At least two Ninth Circuit cases have held that the state

23  court's failure to include a comparative analysis of struck jurors and empaneled jurors constitutes an

24  unreasonable application of *Batson*, which, in turn, necessitates de novo review by the federal

25  habeas court. *See Green v. LaMarque*, 532 F.3d 1028, 1031 (9th Cir. 2008); *Kesser v. Cambra*, 465

26  F.3d 351, 356-58, 360 (9th Cir. 2006).

27      The state district court's order denying Libby's *J.E.B.* claim establishes that the state court

28  went well beyond merely accepting, at face value, Bullock's proffered reasons for exercising the

1    peremptory challenges at issue.  Docket #132-22.  The state court relied on findings of fact that

2    could have been derived only from the trial court's review of the entire jury selection process.  *Id*.

3    Indeed, the order compares Bullock's voir dire of female members to that of male members of the

4    venire and also mentions by name more than twenty members of the venire, other than the seven

5    who were peremptorily challenged by Bullock.  *Id*.

6        Even if the state court fell short of considering "'the totality of the relevant facts' about a

7    prosecutor's conduct" (*Miller-El II*, 545 U.S. at 239), this court is satisfied, based on its de novo

8    review of the record, that it was not unreasonable for the state court to credit Bullock's

9    gender-neutral explanations for the peremptory challenges at issue.  While there are instances in

10   which one of the contributing factors Bullock identified as *part* of his decision to strike a female

11   (e.g., failure to complete the juror questionnaire) also applied to male panelists, Bullock gave

12   multiple reasons for each of his strikes.  Absent from the record is any indication that Bullock's

13   proffered justification for striking a female panelist (or a comparable justification) applied just as

14   well to a male who was permitted to serve.  *See Miller-El*, 545 U.S. at 241.  Claim Two is denied.

15                                 **Claim Five**

16       In Claim Five, Libby claims that his conviction and death sentence violate various

17   constitutional provisions because of instances of prosecutorial misconduct in the State's closing

18   arguments in the guilt phase of his trial.[7]  He points to two comments as the basis for this claim: one

19   in which the prosecutor characterized defense counsel's arguments regarding the evidence as "pure

20   speculation" and an insult to the jury's intelligence, and another in which the prosecutor allegedly

21   misstated the law by equating reasonable doubt with "actual and substantial" doubt.  Docket #39, p.

22   125.

23       "Improper argument does not, per se, violate a defendant's constitutional rights."  *Jeffries v.

24   Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993) (citations omitted).  Habeas corpus relief is available on

---

26   [7]      Additional allegations in Claim Five asserting prosecutorial misconduct in the State's closing
27   argument in the penalty phase (docket #39, p. 126-131) are now moot because Libby has received, for
     each murder, the lightest sentence available, under Nevada law, for first degree murder with use of a
28   deadly weapon.

grounds of improper argument only when the "prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 171 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Relief will be granted when the prosecutorial misconduct amounts to constitutional error, and such error is not harmless under the test announced in *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), which asks whether the error had a substantial and injurious effect in determining the verdict.  *See Fields v. Woodford*, 309 F.3d 1095, 1109, *amended* 315 F.3d 1062 (9th Cir. 2002).

With respect to the disparaging remarks about the defense's case, the prosecutor stayed within the bounds of permissible argument by confining his attack to defense counsel's strategies rather than impugning counsel's personal integrity or credibility.  *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997) ("Criticism of defense theories and tactics is a proper subject of closing argument."); *see also Williams v. Borg*, 139 F.3d 737, 745 (9th Cir.) ("A lawyer is entitled to characterize an argument with an epithet as well as a rebuttal."), *cert. denied*, 525 U.S. 937 (1998).  As for the prosecutor allegedly misstating the law regarding reasonable doubt, the comment in question was in reference to the court's jury instruction.  Docket #129-3, p. 30.  Absent a showing that the comment was inaccurate, much less that it resulted in any unfairness, Libby is not entitled to habeas relief.  See discussion of Claim Sixteen(A), below.  Claim Five is denied.

**Claim Ten**

In Claim Ten, Libby claims that his death sentence is invalid under various constitutional provisions because the trial court removed prospective jurors from the jury panel based on their views on the death penalty without providing Libby an opportunity to prove they were qualified to serve.  According to allegations in Libby's petition, the trial court, *sua sponte*, excused "approximately one-third of the original one hundred-fifty prospective jurors summoned for service."  Docket #39, p. 192.  Just prior to jury selection, in response to an objection that had been filed by defense counsel, the trial judge made the following comment about his decision to reduce the size of the venire:

> This judge and only this judge excused the individuals for the reasons set forth in NRS 6.  That was my guideline.

1

2           It is my understanding of the law it is the duty of this Court to get a sufficient number of prospective jurors to go forward and select a fair and impartial panel, and I have tried to do that.  I arbitrarily said that we would start out with 150, and that is myself, and respective counsel reviewed a questionnaire which was rather lengthy to those folks that were selected at random by computer with help of the Clerk of this Court.  It was my feeling that in a death penalty case, a larger panel would be required.  This is much larger than I usually have.

3

4

5           There are two potential problems, I believe, presented in a death penalty case. Number one, there may be an undue hardship placed upon the jurors, and two, they may be excused because of their attitudes and beliefs about the death penalty.  And I think two is the more important.

6

7

8   Docket #125-4, p. 4-5.  At the conclusion of jury selection, the trial judge, in addressing his

9   resolution of several pretrial motions and issues, stated as follows:

10         . . . I made a decision before that the defendant objected to the jury venire, the Court did follow NRS 6.030 as closely as it could in regards to excuse from service.  A lot of people were excused.  I did involve the lawyers probably more than any judge than they have ever had in excusing a great number of the venire which I thought was the only fair way to do it.  I think the law only requires that we get a sufficient–or a sufficient number of venire men to provide a fair and impartial jury and I sincerely believe we have done that and therefore the aforementioned objection is overruled.

11

12

13

14  Docket #126-1, p. 15-16.[8]

15      On direct appeal, the Nevada Supreme Court decided that this claim lacked merit.  *Libby*,

16  859 P.2d at 1059.  In this court, Libby cites only to *Witherspoon v. Illinois*, 391 U.S. 412 (1968), and

17  *Wainwright v. Witt*, 469 U.S. 412 (1985), as federal law authority governing this claim.  Docket

18  #141, p. 32-34.  While both opinions apply constitutional principles to jury selection issues arising

19  ────────────────

20  [8]     At the time of Libby's trial, Nev. Rev. Stat. 6.030 provided:

21      1. The court may at any time temporarily excuse any juror on account of:

22      (a) Sickness or physical disability.
        (b) Serious illness or death of a member of his immediate family.

23      (c) Undue hardship or extreme inconvenience.
        (d) Public necessity.

24

25      A person temporarily excused shall appear for jury service as the court may direct.

26      2. The court shall permanently excuse any person from service as a juror if he is incapable, by reason of a permanent physical or mental disability, of rendering satisfactory service as a juror. The court may require the prospective juror to submit a physician's certificate concerning the nature and extent of the disability and the certifying physician may be required to testify concerning the disability when the court so directs.

27

28

23

1    in capital cases, neither involves factual circumstances even remotely similar to those presented

2    here.  Indeed, no Supreme Court decision has addressed the constitutional claims at issue in the same

3    factual context.  As such, the Nevada Supreme Court's adjudication of the claim did not result in a

4    decision "that was contrary to, or involved an unreasonable application of, clearly established

5    Federal law, as determined by the Supreme Court," and relief must, therefore, be denied.  *See Wright*

6    *v. Van Patten*, 552 U.S. 120, 126 (2008) (denying habeas relief based on § 2254(d)(1) "[b]ecause our

7    cases give no clear answer to the question presented").

8                                **Claim Eleven**

9         In Claim Eleven, Libby claims that several of his constitutional rights were violated when the

10   trial judge refused to remove a juror for cause despite the juror's inability to be impartial toward

11   Libby.  According to Libby, prospective juror William Jensen should have been excused in

12   accordance with *Witherspoon* and *Witt* because his responses to voir dire questioning demonstrated a

13   bias in favor of testimony from law enforcement officers and the death penalty that would

14   substantially impair his ability to be an impartial juror.  Libby also argues that, because the trial

15   court denied his challenge for cause, he had to use a peremptory challenge to remove Jensen, thereby

16   precluding him from removing either of two other objectionable jurors, Janell Swett and Kathy

17   Gourley.

18        On direct appeal, the Nevada Supreme Court decided that this claim lacked merit.  *Libby*,

19   859 P.2d at 1059.  While that opinion did not include a discussion of the state supreme court's

20   reasoning, the United States Supreme Court rejected a similar claim in which the petitioner alleged

21   that a peremptorily challenged juror who never served on the actual jury was biased.  *See Ross v.*

22   *Oklahoma*, 487 U.S. 81 (1988).

23        The Court in *Ross* held that the trial court's failure to remove the prospective juror for cause

24   did not result in a constitutional violation because an impartial jury claim "must focus not on [the

25   peremptorily challenged juror], but on the jurors who ultimately sat" and "[n]one of those 12 jurors .

26   . . was challenged for cause by petitioner, and he has never suggested that any of the 12 was not

27   impartial."  *Id*. at 86.  The Court also rejected the proposition that "the loss of a peremptory

28   challenge constitutes a violation of the constitutional right to an impartial jury."  *Id.* at 88.  As long

                                             24

1   as the jury that sits is impartial, the loss of a peremptory challenge does not violate the Sixth

2   Amendment. *Id*

3       Having reviewed the entire transcript of Jensen's voir dire, this court finds Libby's

4   contentions as to Jensen's alleged bias to be questionable at best.  *See Uttecht v. Brown*  551 U.S. 1,

5   10 (2007) (holding that AEDPA adds an additional layer of deference to the deference already owed

6   to a trial court's ruling on a challenge for cause).  Even assuming, however, that Jensen should have

7   been excused pursuant *Witherspoon* and *Witt*, *Ross* forecloses habeas relief.  Jensen did not serve on

8   Libby's jury.  Moreover, Libby did not challenge for cause, or otherwise object to the seating of,

9   either Swett or Gourley.  Docket #125-14, p. 44; docket #125-12, p. 20.  Claim Eleven is denied.

10                          **Claim Twelve**

11      In Claim Twelve, Libby claims that his death sentence is invalid under various constitutional

12  provisions because the trial judge failed to excuse a juror who violated the judge's instructions and

13  because the trial judge refused to permit additional voir dire.  The events on which this claim is

14  based occurred when the State filed an interlocutory appeal of the trial court's decision to suppress

15  statements Libby made pursuant to his arrest.  With the jury already empaneled, trial court

16  proceedings were continued pending the Nevada Supreme Court's decision on the matter.

17      The Nevada Supreme Court addressed the claim as follows:

18          Libby contends that the district court erred in refusing to permit individual
19      voir dire to determine the extent of juror exposure to publicity.  The jurors were
        selected in early February, 1990, and on several occasions, they were instructed and
        admonished, pursuant to NRS 175.121, not to discuss the case or to listen to any news
20      or conversation about the case.  Soon after the jury was impaneled and sworn in,
        however, the State filed the interlocutory appeal regarding the "confession" Libby
21      made during his discussion with Chief Hayes.

22          The jury was brought back almost two months later, in April, 1990.  The
        district court again admonished them and conducted a group voir dire, inquiring as to
23      whether any of the jurors had heard any information regarding the case.  One juror
        raised his hand.  The judge asked the other jurors to step out, and he questioned Mr.
24      Scott, the individual who raised his hand. Mr. Scott told the judge that one week
        earlier, he read something about a confession in the Humboldt Sun.  The court
25      excused Mr. Scott.  Counsel for the defense then renewed their motion for change of
        venue and asked for permission to question individual jurors.  According to defense
26      counsel, a female juror had asked a local attorney, Virginia Shane, about the
        confession, and a male juror had asked his supervisor, Norman Sweeney, about the
27      confession.

28          The judge first called Norman Sweeney to the stand.  Sweeney stated that one

                                    25

of his employees, Frank Gastelecutto, was on the prospective panel and that Gastelecutto told him that the week before, he had been listening to the radio when he heard a preface to the news broadcast that the prospective jurors were not to listen. According to Sweeney, Gastelecutto told him that this preface surprised him and he supposed he was to get up and run out of the room. He did not indicate whether he left the room. Counsel for defense requested, but the court denied, individual voir dire of Gastelecutto. Gastelecutto was an alternate juror and he did not participate in deliberation of Libby's case.

Next, Virginia Shane was called to the stand. She stated that juror "Sue Smith" (Shane called her "Sue Smith," but it is clear from the record that she meant "Sue Brown") had asked her if she knew how long it was going to take the Nevada Supreme Court "to rule on this – I don't know if she used the word confession. I think she used the word confession." According to Shane, Smith told her she had read about the confession in the paper, and Shane told her she was not supposed to be reading the paper. Juror Susan Brown was then questioned by defense counsel about her conversation with Shane. Brown said she had inadvertently read the last line of an article regarding the time frame of this court's decision, but she did not know why the matter came to this court. She said she could still be fair and impartial. Brown ultimately was involved in the deliberations of the case. Because Brown was questioned individually and consistently maintained that she could be fair and impartial, the district court did not err in refusing to dismiss her. Gastelecutto was not involved in the ultimate decision of the case and any error in retaining him as an alternate juror was harmless.

Although the scope and method of voir dire are within the discretion of the district court, *Summers v. State*, 102 Nev. 195, 199, 718 P.2d 676, 679 (1986), a defendant must be permitted reasonable voir dire of the prospective jurors. NRS 175.031; *Milligan v. State*, 101 Nev. 627, 708 P.2d 289 (1985). The district court should have allowed defense counsel to question the other jurors individually, even though this examination was supplemental in nature, concerning a specific point. We conclude, however, that the error was harmless. *See Hui v. State*, 103 Nev. 321, 323, 738 P.2d 892, 894 (1987). The court performed a thorough examination and admonishment of the jurors once the trial reconvened, and the district judge asked the specific questions at issue: to wit, whether the jurors had heard anything about the case while they temporarily were recessed. Moreover, there is no indication of juror prejudice against Libby. *See Summers v. State*, 102 Nev. 195, 718 P.2d 676 (1986).

*Libby*, 859 P.2d at 1055-56.

Libby argues that the Nevada Supreme Court's decision was contrary to federal law as established in *Sheppard v. Maxwell*, 384 U.S. 333 (1966) and *Irvin v. Dowd*, 366 U.S. 717 (1961). More specifically, he contends that the Nevada Supreme Court contravened those two cases by failing to assess "the extent of the publicity" or "the effect it had on the jury." Docket #141, p. 40-41.

In both *Irvin* and *Sheppard*, the Supreme Court "overturned a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." *Murphy v. Florida*, 421 U.S. 794, 798 (1975). In *Irvin*, "eight of the 12 jurors had formed an opinion that the defendant was

guilty before the trial began" and "some went 'so far as to say that it would take evidence to overcome their belief' in his guilt." *Murphy*, 421 U.S. at 798 (citing *Irvin*, 366 U.S. at 728).  Based on that, the Court "readily found actual prejudice against the petitioner to a degree that rendered a fair trial impossible." *Id*.  In *Sheppard*, on the other hand, prejudice was presumed based on the circumstances under which the trial was held – i.e, "not only . . .  a background of extremely inflammatory publicity but also . . . a courthouse given over to accommodate the public appetite for carnival." *Id*. at 799.

Here, the proffered evidence related to trial publicity consists of a smattering of newspaper articles and selected transcripts from local radio broadcasts, none of which could be characterized as inflammatory.[9]  Docket #39-3, p.23-31; docket #39-4, p. 359-369.  In the absence of a showing that publicity about his case created an atmosphere that even remotely approximated that which was described in *Sheppard*, Libby can not claim that he was presumptively denied a fair trial.  Instead, he must show that actual juror partiality or hostility precluded a fair trial – i.e., that a juror could not lay aside his preconceived impression or opinion and render a verdict based on the evidence presented in court.  *Irvin*, 366 U.S. at 723.

Libby argues that the trial court's refusal to allow additional voir dire precluded him from demonstrating such prejudice.  On this point, the Supreme Court's decision in *Mu'Min v. Virginia*, 500 U.S. 415 (1991) is instructive.  In that case, the Court noted that its previous cases had "stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias," and reasoned that, with respect to publicity, such deference makes sense because "[t]he judge of that court sits in the locale where the publicity is said to have had its effect. . . ." *Id*. at 427.  Furthermore, the extent of voir dire necessary to satisfy constitutional standards for juror impartiality is governed by the magnitude and potential impact of the publicity:

> . . . Had the trial court in this case been confronted with the "wave of public passion" engendered by pretrial publicity that occurred in connection with Irvin's trial, the Due Process Clause of the Fourteenth Amendment might well have required more

---

[9]     The court notes that, despite Libby's representation that they are from a local newspaper, two of the articles appear to have been published in Libby's home state of Missouri.  Docket #39-3, p. 24.

extensive examination of potential jurors than it undertook here.  But the showings
are not comparable; the cases differ both in the kind of community in which the
coverage took place and in extent of media coverage. . . .

*Id*. at 429.

While his trial took place in a small, rural community, Libby has not demonstrated that the
media coverage was excessive, out of the ordinary, or likely to engender juror bias.  As recounted by
the Nevada Supreme Court in the excerpt above, the trial court's inquiry into possible bias arising
from media coverage related to Libby's confession included not only individual questioning that
resulted in a juror being excused, but also the presentation of extrinsic testimony as to two other
jurors.  Although the Nevada Supreme Court found state law error arising from the trial court's
failure to allow defense counsel to conduct additional voir dire, this court is not persuaded, in light
of the guidance in *Mu'Min*, that such failure rendered the voir dire proceedings so inadequate that
the resulting trial was fundamentally unfair.  *Mu'Min*, 500 U.S. at 425-426.

As for the trial court's refusal to dismiss Susan Brown, the Nevada Supreme Court's decision
on that issue was based on reasonable determination of the facts and neither contrary to, nor an
unreasonable application of, clearly established federal law.  *Wainwright v. Witt*, 469 U.S. 412, 428
(1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  Claim Twelve is denied.

**Claim Fourteen**

In Claim Fourteen,  Libby claims that several of his constitutional rights were violated
because the judge who presided over his trial was biased against him.  In support of this claim,
Libby cites to comments and rulings the trial judge, the Honorable Jerry V. Sullivan, made at a bail
hearing held on February 21, 1990, and to Judge Sullivan's refusal to allow individual voir dire as
alleged in Claim Twelve.  He also claims that, in 1992, Judge Sullivan was the subject of an
"informal" disciplinary action by the Nevada Commission on Judicial Discipline.

At the bail hearing, Judge Sullivan stated as follows in denying Libby's motion to set bail:

I have reviewed the grand jury transcript. . . .  Certainly, there is more than a scintilla
[of evidence].  And I find that we do have proof evident and so on, at that level.

That there was a capital offense, if I were to consider the confession I would find that
beyond a reasonable doubt he had done this.  I don't know that I can do that.  I think

28

the State may be right that I could consider that.

However, there is the quantum of evidence necessary in the grand jury transcripts to say no bail on this case. I have some discretion and that will be the decision of this Court. You are remanded to the custody of the Sheriff's custody.

Docket #126-6, p. 11-12. At a hearing on April 4, 1990, Libby's counsel made an unsuccessful motion to disqualify Judge Sullivan, claiming that the foregoing comments showed bias toward the merits of Libby's case. Docket #128-18, p. 14-15.

On appeal, Libby argued that, under Nevada law, Judge Sullivan erred by denying the motion himself rather than appointing another judge to rule on it. Docket #130-15, p. 29-32. He further argued that the failure to transfer the matter to another judge resulted in a violation of his rights under the Sixth and Fourteenth Amendments. *Id.* The Nevada Supreme Court rejected the argument:

Although the district court erred in failing to follow the procedure mandated by the statute and have another judge determine whether Judge Sullivan was biased, we conclude that the error was harmless.

The allegedly biased comment was not a basis for the disqualification of a district judge, and there is no indication of bias during any phase of the trial.

*Libby*, 859 P.2d at 1054-55.

Because the state supreme court did not reach Libby's federal law claim, this court reviews the claim de novo. As an initial matter, this court finds no merit to Libby's argument that Judge Sullivan deprived him of a state law liberty interest in failing to have another judge rule on his motion for disqualification. Even assuming the Nevada statute at issue created such an interest, Libby would not be entitled to habeas relief under the circumstances present here. *See Arreguin v. Prunty*, 208 F.3d 835, 837 (9th Cir. 2000) (holding that state appellate court's application of a harmless error analysis sufficient to satisfy the standard for state-created liberty interests).[10]

The Due Process Clause guarantees a criminal defendant the right to a fair and impartial judge. *In re Murchison*, 349 U.S. 133, 136 (1955). To prevail on a judicial bias claim, however, a

---

[10]     The court also rejects Libby's impartial jury claim. The claim is duplicative of the claim raised in Claim Twelve.

1   petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators."

2   *Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

3       In *Liteky v. U.S.*, 510 U.S. 540 (1994), the majority opinion discusses at length the

4   circumstances under which judicial bias or prejudice requires recusal of a presiding judge.  510 U.S.

5   at 544-56.  Although the discussion was ultimately concerned with the proper interpretation of a

6   federal recusal statute (28 U.S.C. § 455), the Ninth Circuit has relied on the principles set forth in

7   *Liteky* in determining whether a habeas petitioner has a meritorious Fourteenth Amendment claim

8   for deprivation of a fair trial based on judicial bias.  *See*, *e.g.*, *Larson v. Palmateer*, 515 F.3d 1057,

9   1067 (9th Cir. 2008); *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir.1997) (applying *Liteky* to

10  judicial bias claim in death penalty case).

11      Among the oft-cited principles discussed in *Liteky* is that bias can "almost never" be

12  demonstrated solely on the basis of a judicial ruling.  510 U.S. at 555.  In essence, where there is no

13  allegation that an extrajudicial source of prejudice, a judge's actions occurring in the course of a

14  judicial proceeding will be grounds for a judicial bias claim only if they "display a deep-seated

15  favoritism or antagonism that would make fair judgment impossible."  *Id*.  Here, neither the judge's

16  comments at the bail hearing, nor his actions or rulings with respect to voir dire rose to this level.

17  As for the alleged disciplinary action, Libby's allegations and proffered evidence fails to establish

18  any connection whatsoever between any misconduct Judge Sullivan may have committed and his

19  adjudication of Libby's case.  Consequently, Libby is not entitled to habeas relief based on Claim

20  Fourteen.

21                    **Claim Sixteen(A)**

22      In Claim Sixteen(A), Libby contends that his conviction and death sentence are in violation

23  of various constitutional rights because the trial judge issued improper jury instructions related to

24  reasonable doubt, equal and exact justice, premeditation and deliberation, and malice aforethought.

25  In *Estelle v. McGuire*, 502 U.S. 62 (1991), the Supreme Court outlined the proper inquiry for

26  determining the constitutional validity of a jury instruction:

27          . . . [T]he fact that the instruction was allegedly incorrect under state law is

28                                    30

not a basis for habeas relief. Federal habeas courts therefore do not grant relief, as might a state appellate court, simply because the instruction may have been deficient in comparison to the [state's model instructions]. The only question for us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380 (1990). And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

502 U.S. at 71-72.

With regard to the reasonable doubt jury instruction, Libby claims that it "minimized the state's burden of proof" and "inflated the constitutional standard of doubt necessary for acquittal." Docket #141, p. 43. The instruction at issue read as follows:

> The defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense.

> A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.

> If you have a reasonable doubt as to the guilt of the defendant, he is entitled to a verdict of not guilty.

Docket #129-5, p. 16 (Instruction No. 12).

The constitutionality of the reasonable doubt jury instruction depends on "'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet' the requirements of due process." *Ramirez v. Hatcher*, 136 F.3d 1209, 1211 (9th Cir. 1998) (quoting *Victor v. Nebraska*, 511 U.S. 1, 6 (1994)). The jury instruction on reasonable doubt used at Libby's trial was the same instruction challenged in *Ramirez,* which the court of appeals criticized but nonetheless upheld as constitutional. 136 F.3d at 1214-15; *see*, *also*, *Nevius v.*

1  *McDaniel*, 218 F.3d 940, 944-45 (9th Cir. 2000).  As such, the law of this circuit forecloses habeas

2  relief based on that jury instruction.

3           As for the jury instruction referring to "equal and exact justice," the trial court issued the

4  following as a concluding instruction:

5           Now you will listen to the arguments of counsel who will endeavor to aid you
         to reach a proper verdict by refreshing in your minds the evidence and by showing
6        the application thereof to the law; but whatever counsel may say, you will bear in
         mind that it is your duty to be governed in your deliberation by the evidence as you
7        understand it and remember it to be and by the law as given you in these instructions,
         with the sole, fixed and steadfast purpose of doing equal and exact justice between
8        the defendant and the State of Nevada.

9  Docket #129-1, p. 47-48.  While Libby contends that the "equal and exact" language undermined the

10 presumption of innocence to which he was entitled and led the jury to believe that it could convict

11 him based upon a lesser burden of proof than beyond a reasonable doubt, a  reasonable juror, taking

12 the instructions as a whole, would not interpret the instruction in such a manner.  Because other

13 instructions specifically addressed the presumption of innocence and the burden of proof necessary

14 for a conviction, this court rejects the notion that the jury was misled on these concepts due to one

15 ambiguous phrase in a lengthy set of instructions.

16          The instruction on "premeditation and deliberation" that Libby claims was defective read as

17 follows:

18          The unlawful killing must be accompanied with a deliberate and clear intent
         to take life in order to constitute murder of the first degree.  The intent to kill must be
19       the result of deliberate premeditation.  There need be no appreciable space of time
         between the intention to kill and the act of killing; they may be as instantaneous as
20       successive thoughts of the mind.  It is only necessary that the act of killing be
         preceded by a concurrence of will, deliberation, and premeditation on the part of the
21       slayer and, if such is the case, the killing is murder in the first degree, no matter how
         rapidly these acts of the mind may succeed each other, or how quickly they may be
22       followed by the act of killing.

23          The element of intention alone, as an element of the offense, may be
         ascertained or deduced from the facts and circumstances of the killing.

24

25 Docket #129-5, p. 30 (Instruction No. 26).  According to Libby, the instruction was unconstitutional

26 because the concept of "instantaneous premeditation" described in the instruction erased the

27 distinction between first and second degree murder and relieved the State of its burden of proof on

28 an essential element of first degree murder.

Despite Libby's arguments to the contrary, the foregoing instruction, especially when read in the context of the other instructions, did not create a reasonable likelihood that the jury would not be able to distinguish between the elements of first degree and second degree murder under Nevada law. To begin with, the instruction is *not* the *Kazalyn* instruction the Ninth Circuit held to be a violation of the petitioner's right to due process in *Polk v. Sandoval*, 503 F.3d 903 (9th Cir. 2007).[11] Unlike the *Kazalyn* instruction,[12] the instruction at issue here did not "define[] away 'willful' and 'deliberate' by equating them with 'premeditated.'"[13] *Polk*, 503 F.3d at 911. The Ninth Circuit found the *Kazalyn* instruction defective "because it relieved the state of the burden of proof on whether the killing was deliberate *as well as* premeditated." *Id.* at 910 (emphasis added).

Libby's claim, as set forth in his petition, is not that the instruction conflated premeditation and deliberation, but that it defined premeditation in a way (i.e., by indicating that it can be "instantaneous") that made it indistinguishable from the malice aforethought component of second degree murder. Docket #39, p. 242-43. This court notes, however, that the "new instruction" on premeditation recommended by the Nevada Supreme Court, when it abandoned the *Kazalyn* instruction, also provides that premeditation "may be as instantaneous as successive thoughts of the mind." *Byford v. State*, 994 P.2d 700, 714–15 (Nev. 2000). States are free to define the elements of state crimes. *See Apprendi v. New Jersey*, 530 U.S. 466, 484-87 (2000); *McMillan v. Pennsylvania*, 477 U.S. 79, 84-86 (1986).

No fewer than six jury instructions informed Libby's jury that deliberation and premeditation

---

[11]     Respondents' erroneously make that assumption in their answer (docket #120-6, p. 19); and Libby claims likewise in his reply (docket #141, p. 50).

[12]     So named because the instruction first appeared in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992).

[13]     Absent from the jury instructions in Libby's case is the following language that the Ninth Circuit focused upon in *Polk*:

> . . . For *if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation*, no matter how rapidly the premeditation is followed by the act constituting the killing, *it is willful, deliberate and premeditated murder*.

503 F.3d at 905 (emphasis added in *Polk* opinion).

distinguished first degree murder from second degree murder.  Docket #129-5, pp. 27-30, 37, 39 (Instruction Nos. 23, 24, 25, 26, 33, and 35)).  "Deliberate" and "premeditate" were each defined in a separate instruction. (*Id*., p. 33-34 (Instruction Nos. 29 and 30)).  Taken as a whole, the instructions explained to the jury that, to establish first degree murder, the State was required to prove beyond a reasonable doubt that Libby not only intended to kill, but that he considered or pondered the act, then decided to carry it out.  No constitutional violation resulted from the trial court's issuance of Instruction No. 26.

Finally, Libby claims that the court's jury instruction on malice aforethought contained an implied malice component that impermissibly shifted the burden of proof by creating a mandatory presumption and blurred the distinction between first degree and second degree murder by failing to identify the basic facts from which malice shall be implied.  The instruction at issue stated, in part, as follows:

> Malice aforethought, as used in the definition of murder, means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation. . . .
>
> . . .
>
> Express malice is that deliberate intention unlawfully to take away the life of a creature, which is manifested by external circumstances capable of proof.
>
> Implied malice is when no considerable provocation appears, or when all the circumstances of the killing show an abandoned or malignant heart.
>
> . . .

Docket #129-5, p. 38 (Instruction No. 34).  Libby's claim based on this instruction lacks merit because, regardless of whether the instruction is lacking in a general sense, there is no reasonable likelihood that the jury applied it in a way that violated Libby's constitutional rights.

The jury in Libby's case found him guilty of first degree murder because it found either that the murders were committed in the course of a robbery (the felony murder rule) or that they were willful, deliberate, and premeditated acts.  If the former, the felony murder presumes malice aforethought under Nevada law. *Collman v. State*, 7 P.3d 426, 444 (Nev. 2000).  If the latter, then the elements of willfulness, premeditation, and deliberation conclusively established express malice, with no need to rely upon implied malice. *Scott v. State*, 554 P.2d 735, 738 (Nev. 1976).  Claim

34

1   Sixteen(A) is denied.

2          IV.  CONCLUSION

3          For the reasons set forth above, Libby is not entitled to habeas relief and, therefore, his

4   petition is denied.

5                              *Certificate of Appealability*

6          Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing

7   Section 2254 Cases requires this court to issue or deny a certificate of appealability (COA).

8   Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for the

9   issuance of a COA.  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir.

10  2002).

11         Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

12  substantial showing of the denial of a constitutional right."  With respect to claims rejected on the

13  merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

14  assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484

15  (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA

16  will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the

17  denial of a constitutional right and (2) whether the court's procedural ruling was correct.  *Id.*

18         Having reviewed its determinations and rulings in adjudicating Libby's petition, the court

19  finds that the *Slack* standard is not met with respect to the court's resolution of any procedural issues

20  or substantive claims.  Thus, the court declines to issue a certificate of appealability

21         **IT IS THEREFORE ORDERED** that petitioner's amended petition for writ of habeas

22  corpus (docket #39) is DENIED.  The Clerk shall enter judgment accordingly.

23         **IT IS FURTHER ORDERED** that a Certificate of Appealability is DENIED.

24  ///

25  ///

26  ///

27  ///

28

35

1          **IT IS FURTHER ORDERED** that petitioner's motions to set bond (docket ##152/154) are

2    DENIED.

3          DATED this 30th day of March, 2011.

4

5

6                                              _____

7                                              LARRY R. HICKS
                                               UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36